| |
|---|
| UNITED STATES BANKRUPTCY COURT <br> DISTRICT OF NEW JERSEY <br> Caption in Compliance with D.N.J. LBR 9004-1 <br> 2014-0180 <br><br> POWERS KIRN, LLC <br> ecf@powerskirn.com <br> William M. E. Powers III <br> 728 Marne Highway, Suite 200 <br> Moorestown, NJ 08057 <br> 856-802-1000 <br> Attorney for PennyMac Corp. |
| In Re: <br><br> Yolanda C. Perry |

Case No.: 16-10057-MBK

Hearing Date: 12/19/2016 at 10:00 am

Judge: Honorable Michael B. Kaplan

Chapter: 11

## OBJECTION TO CONFIRMATION OF COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT

Yolanda C. Perry
178 Liberty Corner Road
Far Hills NJ 07931

Courtney A. Schael, Esquire
511 Summit Avenue
Westfield NJ 07090

United States Trustee's Office
1 Newark Center
1085 Raymond Boulevard, Suite 2100
Newark NJ 07102

PLEASE TAKE NOTICE that PennyMac Corp., ("PennyMac") through its attorney hereby objects to the adequacy and confirmation of the Individual Debtor's Combined Plan of Reorganization and Disclosure Statement filed on November 6, 2016. (Document #37). For purposes of clarity, the term "Plan" shall refer to Document #37 and the corresponding page numbering that was assigned when the document was filed. PennyMac contends that the information contained within the Plan is

inaccurate, incomplete, and confusing to the point of rendering the Plan inadequate and not confirmable in its existing form for the following reasons:

1. The centerpiece of the Plan is a proposed sale of the debtor's residence, 178 Liberty Corner Road, Far Hills, New Jersey 07931, however, it is unclear whether the debtor is even capable of conveying a marketable to the residence in order to sell the property based on the information provided. The Plan does not explicitly state the manner in which title to the real property is currently held. The debtor's use of the word "her" in the Summary Of The Plan And Distribution to Creditors indicates that the debtor is the owner of the property, but it is unclear whether title is currently held individually, jointly, or as a tenancy by the entirety. This information should be provided by the debtor in the section discussing the debtor's assets under Article 1, ¶1.4., so that a hypothetical investor could make an informed judgment about the Plan. If the debtor does not possess this information, then a report of title should be obtained and attached to the Plan.

2. The Background of the Debtor section under Article 1 of the Plan is not fully developed to provide a hypothetical investor a true sense of what this case is about. The debtor is described as retired and receiving social security income of $520 per month with a non-debtor spouse who is employed, but he is not a debtor in the case despite the fact that according to the Plan he is currently receiving income of $10,000 monthly, and has prospects of earning approximately $25,000 monthly. Significantly, there is no explanation offered why the debtor's spouse is not a debtor in this case where both William H. Perry and Yolanda C. Perry are co-debtors on the mortgage obligation, which along with tax claims of the Internal Revenue Service are listed as the debtor's only liabilities. See Plan at Page 4-5, ¶ 1.2, ¶1.3. and ¶1.5.

Debtor's assets are described as Debtor's Residence and unspecified personal property that debtor values at $1,500 and has indicated is exempt. Plan at Page 4, ¶1.4. However, this disclosure by

the debtor is obviously false because the debtor did not claim any exemptions on Schedule C. The debtor's representation that the personal property being worth $1,500 is also without any support or basis. Meanwhile, photographs of the debtor's residence on Realtor.com display personal property that is clearly worth more than $1,500. If it is the debtor's position that the non-debtor spouse owns all assets other than debtor's residence and very limited personal property, which debtor has assigned a nominal vale, then this is something that should be explained in the section entitled "Other Relevant Financial Data" in ¶1.6. at Page 5 of the Plan. Likewise, the actual balance in the DIP account is never mentioned anywhere in the Plan. It stands to reason that the DIP account balance would ideally be disclosed either in ¶1.4 or ¶1.6 at Pages 4 or 5 of the Plan.

3. The Plan is largely boilerplate language copied for a model template appearing on the website for the United States Bankruptcy Court for the District of New Jersey. There are no administrative expenses or fees listed except a $15,000 legal fee that debtor's counsel is apparently charging to handle this matter. See Plan at Pages 6 - 7. The plan does not provide for any fees payable to the United States Trustee. The Plan also lists a tax claim owed to the Internal Revenue Service, which according to the plan is to be paid over 36 months from the effective date in monthly installments of $361. See Plan at Page 8. It is unclear how the claims of the Internal Revenue Service are going to be satisfied through a total debtor commitment that totals only $12,996.

4. Review of the Plan reveals that PennyMac's claim comprises Class 1, and it is listed as an impaired class as is Class 2, which is comprised of general unsecured claims. The Bankruptcy Code defines impairment at 11 U.S.C. §1124, and it provides that "a class of claims is impaired under a plan unless, with respect to each claim or interest of such class, the plan - leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or . . ." 11 U.S.C. §1124(1). By definition and the Plan concedes that debtor is proposing to

alter the legal and equitable rights of PennyMac, who holds a claim is secured solely by a security interest in the debtor's principal residence. More specifically, the treatment to be accorded PennyMac's secured claim is described as "[t]he Debtor will sell the collateral securing Claims in this Class. Claims secured by the collateral will be paid in full with interest at the closing fo the sale. The Debtor will make no payments pending the closing of the sale. Secured Creditors may not possess or dispose of their collateral so long as the Debtor is not in material default in performing her obligations under the Plan." ¶2.2.A.1 at Page 8 of the Plan.

The Plan provides for a suspension of payments to PennyMac while the debtor attempts to sell the property for what could be potentially a lengthy period of time. Thus, the Plan is patently unconfirmable as a matter of law since the Plan is proposing a modification of PennyMac's rights in direct violation of the protection afforded by 11 U.S.C. §1123(5)(5), and therefore, the Plan has not been proposed in good faith and not by any means forbidden by law as required for confirmation pursuant to 11 U.S.C. §1129(a)(3). The fact that the plan does not propose adequate protection payments to PennyMac also proves fatal to confirmation of the Plan since 11 U.S.C. §1129(b) (2) requires that holder of secured claims must realize the indubitable equivalent of such claims.

Additionally, the mechanics by which the proposed sale is to be accomplished under the Plan is not adequately explained. All pertinent information in relation to a proposed sale is either missing or left open-ended. Although the Plan indicates that a real estate professional has been retained to market the residence, none of the pertinent information pertaining to the listing agreement including, but not limited to, the compensation to be paid such realtor and term of the listing is not provided. The hypothetical investor is left to guess what the debtor might have in mind except that she intends to reduce the listing price by an unspecified amount, if the property is not sold by year end.[1] The disclosure statement

---

[1] See ¶2.5 Means for Implementation of Plan at Page 10 of Plan.

appears to be drafted in a deliberately vague fashion that is designed to violate both the spirit and intent of the disclosure requirements embodied in 11 U.S.C. §1125.

Even if the Plan were taken at face value by assuming that the debtor's residence is actually worth $2,700,000,[2] which has never been established through an appraisal, a pending contract or other credible evidence, the debtor does not have any equity to be realized from a sale of the residence when a cost of sale is deducted from a gross sales price of $2,700,000. When a reasonable 10% cost of sale is imputed, the transaction yield net proceeds of $2,430,000, which is less than PennyMac's claim.[3] While it might be the debtor's intention to challenge the extent of PennyMac's claim as indicated in the chart at Page 9 of the Plan in what appears to be an attempt to create equity where non exists[4], this strategy would be futile because the instant case presents a situation analogous to *In re Price*, 361 B.R. 68 (Bankr. D.N.J. 2007). The debtor's serial bankruptcy filings has delayed PennyMac from executing upon its foreclosure judgment and caused PennyMac to absorb the carrying costs of the residence since entry of the foreclosure judgment on March 9, 2015. The Plan also cannot be confirmed as the confirmation requirement of 11 U.S.C. §1129(a)(2), which requires that the Plan comply with the applicable provisions of Title 11, is not satisfied because 11 U.S.C. §363(f)(3) prohibits a sale for a price that does not exceed the aggregate value of all liens on the property.

4.  Means for Implementation of the Plan indicates that the Plan will be funded through $15,000 in cash contributed by the non-debtor spouse, a sale of debtor's residence, and projected disposable income contributed by the non-debtor spouse, which is projected to be $25,000/month for

---

[2] See Plan at Page 4, ¶1.4.

[3] PennyMac filed a secured proof of claim in the amount of $2,587,051.81 on April 6, 2016, which claim is reflected in the claims registry as Claim #2.

[4] The Plan acknowledges that "[t]he anticipated net proceeds from the sale of this property are less than the amount of the secured creditor's claim." See Plan at Page 12, Article 4.

each year following confirmation[5]. The Plan appears to suggest that a non-debtor spouse will be contributing funding for the Plan which totals $915,000.[6] Because this individual Chapter 11 proceeding was filed in the name of only one spouse, who is reported to be retired and having only a very modest income, debtor's counsel has effectively shielded the financial dealings and the earning spouse from scrutiny by the Court, creditors, and the U.S. Trustees' Office. More importantly, the reports that debtor filed do not contain complete, accurate and reliable information. This behavior, of course, undercuts or defeats the very foundation upon which bankruptcy relief is accorded. The decision *In re Waldron, 785 F.2d 936 (11th Cir. 1986)*, succinctly explained the importance of disclosure:

> Unmistakable manifestations of bad faith need not be based upon a finding of actual fraud, requiring proof of malice, scienter or an intent to defraud. We simply require that the bankruptcy courts preserve the integrity of the bankruptcy process by refusing to condone its abuse.
>
> The cornerstone of the bankruptcy courts has always been the doing of equity. The protections and forgiveness inherent in the bankruptcy laws surely require conduct consistent with the concepts of basic honesty. Good faith or basic honesty is the very antithesis of attempting to circumvent a legal obligation through a technicality of the law.

*Id.* at 941. It follows that concealment of the financial dealings and earnings of a non-debtor spouse, who is to provide substantial funding under the Plan is inconsistent with the concept of good faith. Accordingly, the Plan fails to satisfy the confirmation requirement of 11 U.S.C. §1129(a)(3).

5. Feasibility of the Plan is premised upon an unsubstantiated representation that debtor has projected monthly income of $27,638 and projected monthly expenses of $13,538 which leaves a surplus of $14,100.00 available to fund the Plan. Oddly, the Plan does not contain a detailed itemization for these figures, but rather it seems to contain contradictory information in the form of the remark "[t]he projected monthly income is based on the Debtor's current income combined with her non-debtor

---

[5] See Plan at Page 11, ¶2.5

[6] $15,000 + ($25,000 x 36) = $915,000

husband's current income and projected additional income from self-employment in the amount of $25,000 per month. It is unclear why the Plan states the debtor's projected monthly income at $27,638 and the non-debtor spouse's projected monthly income is stated in the amount of $25,000 in the following paragraph. See Plan at Page 12.

6. The supporting documentation attached as Article 7, which purports to support the Plan, in actuality undercuts support for the Plan. Exhibit A contains a partially completed Schedule I which sets forth income that totals only $2,658. Interestingly, there is no deduction for income taxes on either of the updated Schedules I or J attached as Exhibit A. When the monthly expenses totaling $13,538 are deducted from the income of $2.658, there is a negative monthly net income of -$10,880, which shows that debtor lacks adequate income to fund any plan. Exhibit B purports to be the last monthly operating report filed in this case which covers the month of September 2016. The report shows the DIP account with ending balance in the amount of $19.35 for the reporting period ending September 2016. Exhibit C is an printed version of a Zillow.com listing showing the debtor's residence to be listed with Lydia Markevich of Weichert for $2,790,000. The Zillow listing shows a similar home listed for sale on the same road as the debtor's residence which is listed at $1,995,000. The listing also shows five nearby sales closed between May 2, 2016 and October 5, 2016 for prices between $1,450,000 and $1,900,000, which suggest that the subject property is listed approximately $900,000 - $1,300,000 more that what comparable properties have been recently sold. Exhibit D is a printed version of claims registry showing that the Internal Revenue Service filed a priority claim for $13,021.23 and PennyMac filed a secured claim in the amount of $2,587,051.81.

Noticeably absent from the attachments are an appraisal of the debtor's assets, financial projections over the course of the Plan, the Debtor's most recent financial statements issued before the bankruptcy, a summary of the debtor's periodic operating reports, tables showing the amount of case on

hand as of the Effective Date, and source of that case, and a Liquidation Analysis. A summary prepared by PennyMac of the partial operating reports filed by debtor in this matter is attached hereto as Exhibit "A". The operating reports that have been filed show that the total income from operations during the bankruptcy is $13.97 which works out to an average of $1.75 per month for 8 months that reporting was made available. The attached bank statements for the DIP account show a beginning balance of $5.98 and an ending balance of $19.95 which confirms the net gain from operations of $13.97. It suffices to say that the plan is infeasible, and the confirmation requirement of 11 U.S.C. §1129(a)(11) is not satisfied by any stretch of imagination.

7.      The case would appear ripe for dismissal for cause as recognized by 11 U.S.C. §§1112(b)(4)(A), (B) or (F) inasmuch as the case has been pending for almost a year without significant progress having been achieved, and the debtor was previously received a Chapter 7 discharge.

TAKE FURTHER NOTICE that the objecting creditor's attorneys shall be appearing at the confirmation hearing(s) and requesting a counsel fee to prosecute its objections.

POWERS KIRN, LLC


/s/ William M. E. Powers III
BY: William M. E. Powers III

DATED: December 12, 2016